**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

THE UNITED STATES OF AMERICA    )
and STATE OF MISSOURI,    )
    )
    )
    Plaintiffs,    )    Case No. 4:20-cv-00234-SRC
    )
    vs.    )
    )
THE DOE RUN RESOURCES    )
CORPORATION, et al.,    )
    )
    Defendants.    )

<u>**Memorandum and Order**</u>

This matter comes before the Court on [8] the United States' Unopposed Motion to Enter

Consent Decree (the "Motion").  The Court has reviewed the Consent Decree, Doc. 2-1 (the

"Consent Decree"), for procedural and substantive fairness, reasonableness, and consistency with

CERCLA.  *See United States v. Hercules*, 961 F.2d 796, 800 (8th Cir. 1992) (citing *United States*

*v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992); *United States v.*

*Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)).  Having fully considered the Motion, the

United States' Memorandum in Support thereof, Doc. 9 (the "Memorandum"), and the Consent

Decree, the Court grants the Motion. and makes the following findings and conclusions:

I.    **BACKGROUND**

1.    On February 11, 2020, the United States and State of Missouri (the "Plaintiffs")

filed a joint Complaint in this matter alleging The Doe Run Resources Corporation, the Buick

Resource Recycling Facility, and the Homestake Lead Company of Missouri (the "Settling

Defendants") are liable under Section 107 of CERCLA, 42 U.S.C. § 9607 and Mo. Rev. Stat. §

644.096 of the Missouri Clean Water Law, for damages for injury to, destruction of, and loss of

Natural Resources and their services resulting from releases and threatened releases of hazardous substances at or from facilities now or formerly owned and/or operated by the Settling Defendants, including the costs of assessing the damages.  Doc. 1 (the "Complaint").  The Complaint and Consent Decree cover all locations (the "Sites")[1] at which these hazardous substances have allegedly come to be located.

2.      "Congress enacted CERCLA to facilitate the cleanup of hazardous waste sites, and to shift the costs of environmental response from taxpayers to the parties who benefitted from the use or disposal of the hazardous substances."  *Dico, Inc. v. Amoco Oil Co.*, 340 F.3d 525, 529 (8th Cir. 2003) (quoting *Avial Servs., Inc. v. Cooper Indus. Inc.*, 263 F.3d 134, 136-37 (5th Cir. 2001)).  CERCLA authorizes natural resource trustees to assess the extent of injury to natural resources under their trusteeship, recover natural resource damages for the restoration, replacement, or acquisition of the equivalent of those injured resources, and to enter into judicially-approved consent decrees requiring responsible parties to conduct projects to restore, replace, or acquire the equivalent of the injured resources.  *See* 42 U.S.C. §§ 9607(a), (f) and 9622(j)(2).

3.      The Plaintiffs filed this action on behalf of their respective federal and State trustees for natural resources at the Sites.  The United States Department of the Interior, the United States Department of Agriculture, and the Missouri Department of Natural Resources on

---

[1] "The Sites" are defined as the following: Viburnum Mine and Central Mill complex (consisting of Viburnum #27 Mine, the Viburnum #28 Mine and Central Mill, and Viburnum #29 Mine), Casteel Mine, Buick Mine and Mill, Brushy Creek Mine and Mill, Fletcher Mine and Mill, Sweetwater Mine and Mill, West Fork Mine and Mill, the Magmont Mine and Mill, the Buick Smelter, Buick Resource Recycling Facility (formerly the Buick Smelter), Glover Smelter, and the Herculaneum Smelter, generally depicted on the map attached as Appendix C, and anywhere hazardous substances released at or from, or during transportation to or from, any of these facilities have come to be located, including all connecting and/or adjacent haul roads and rail lines, and adjacent and/or surrounding lands, groundwater, and streams, including, but not limited to, Indian Creek, Crooked Creek, West Fork of Crooked Creek, Strother Creek, Lick Hollow Creek, Bills Creek, Bee Fork, Adair Creek, Logan Creek, Sweetwater Creek, West Fork of Black River, Scroggins (a/k/a Scoggins) Branch, Big Creek, and Joachim Creek.  Consent Decree at ¶ 3.w.

behalf of the State of Missouri (the "Trustees") are designated under CERCLA and 40 C.F.R. Part 300, Subpart G as the Trustees of natural resources that are managed, controlled by, or appertain to them.  Consent Decree ¶ A.  The Plaintiffs allege that natural resources at the Sites that are under the trusteeship of the Trustees have been injured as a result of releases of hazardous substances at or from the Settling Defendants' facilities or former facilities. Complaint, Doc. 1; Consent Decree at ¶ A-D.

4.      All of the Sites but one are within an historic lead-mining district known as the Viburnum Trend in Southeastern Missouri.  The remaining Site, the Herculaneum Lead Smelter Site, is located in the City of Herculaneum in Jefferson County, Missouri.

5.      Settling Defendants deny the allegations in the Complaint and do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint and the matters alleged in the Consent Decree.  Consent Decree at ¶ G.

6.      Settling Defendants have consented to entry of the Consent Decree.  Consent Decree at ¶ 69.  Settling Defendants agree that the Decree has been negotiated in good faith, that settlement of this matter will avoid prolonged and complicated litigation between the Parties, and that this Decree is fair, reasonable, and in the public interest.  Consent Decree at ¶ H.

7.      Under the proposed consent decree, Settling Defendant Homestake Lead Company of Missouri ("Homestake") will pay the Trustees $1.8 million for past Natural Resource Damage Assessment ("NRDA") costs and $100,000 for future restoration planning, implementation and monitoring, and place $1.44 million in a restoration work trust account for use by Settling Defendant The Doe Run Resources Corporation ("Doe Run") in performing the restoration work required by the consent decree.  *See* Consent Decree at ¶¶ 4-6, 7.a, 8.

Homestake will also post financial assurance of $2 million to partially guarantee Doe Run's restoration work at the Buick Smelter.  Id. at ₱ 10.

8.      The Consent Decree requires Settling Defendant Doe Run to 1) donate to the Trustees or a mutually acceptable designee approximately 1,100 acres of ecologically valuable land containing high-quality habitat for conservation and protection;  2) perform direct restoration on approximately 1,000 acres of its tailings ponds and 240 acres of transition zones around those ponds, at the time those facilities are closed, and 30 acres of highly contaminated land at the Sweetwater Mine and Mill; 3) perform direct restoration on soils within an area of approximately 810 acres of highly contaminated habitat injured by fallout from the Buick Smelter within eight years of the Effective Date; 4) perform direct restoration via annual removal of contaminated sediment from approximately 10 miles of streams for a period of eight years after the Effective Date; and 5) annually reimburse the Trustees for up to $25,000 in restoration implementation and oversight costs that they incur in any year in which Doe Run performs restoration work.  See Consent Decree at ₱₱ 7.b, 16, 18; Consent Decree Appendix A, Doc. 2-2 at ₱₱ 17-25 (property donations), 26-39 (aquatic restoration), 40-53 (terrestrial restoration).

9.      In exchange for these payments and restoration work, the Consent Decree provides Doe Run (on its own behalf and on behalf of the Doe Run Company and its other general partners), the Buick Resource Recycling Facility, LLC, and Homestake covenants not to sue under Section 107 of CERCLA, 42 U.S.C. § 9607, Section 311 of the Clean Water Act, 33 U.S.C. § 1321, and analogous state law, for the recovery of Natural Resource Damages.  Consent Decree at ¶ 49.  The Settling Defendants grant mutual covenants back to the Plaintiffs.  Id. at ₱ 53.  The Consent Decree also provides the Settling Defendants with contribution protection for the matters addressed.  Id. at ₱ 56.

10.     The Consent Decree contains reservations of rights by the Plaintiffs, including the right to pursue the Settling Defendants for natural resource damages based on new conditions or new information about the natural resource injuries at the Sites.  Consent Decree at ¶¶ 51, 52. The Decree also provides the Plaintiffs with the right to demand stipulated penalties for failure to comply with its provisions in addition to any other form of appropriate relief.  *Id.* at § X.

## II.     THE CONSENT DECREE IS FAIR, REASONABLE, AND CONSISTENT WITH CERCLA

11.     Based on the representations in the Motion and Memorandum, the allegations in the Complaint, and the provisions of the Consent Decree, the Court concludes as follows regarding the Consent Decree's fairness, reasonableness, and consistency with CERCLA.

12.     <u>Procedural Fairness.</u>

a.    A CERCLA settlement must be both procedurally and substantively fair. *Cannons Eng'g*, 899 F.2d at 86–88.  "To determine procedural fairness a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance."  *United States v. Union Elec. Co.*, 934 F. Supp. 324, 327 (E.D. Mo. 1996) (quoting *Cannons Eng'g*, 899 F.2d at 86)).  Relevant facts in determining procedural fairness include whether "the cards have been dealt face up," i.e., whether the parties are knowledgeable about the issues, whether the parties have conflicting interests, and whether the parties are represented by experienced lawyers.  *Cannons Eng'g*, 899 F.2d at 84.

b.    According to the Memorandum, the proposed Consent Decree was negotiated over a period of nearly six years, including three years with the assistance, and under the supervision, of an experienced and knowledgeable neutral mediator.  Memorandum at 9. During that process, all parties were represented by sophisticated legal counsel with experience in these types of matters.  Counsel held several in-person negotiation and mediation sessions and

exchanged voluminous written material.  The Consent Decree is "the result of good faith arms-length negotiations," *Hercules*, 961 F.2d at 800, and therefore arises out of a procedurally fair process. *See Union Elec.*, 934 F. Supp. at 328 (approving "an open and candid dialogue" for purposes of procedural fairness.)

      13.   <u>Substantive Fairness</u>.

          a.   To determine substantive fairness, the court evaluates "corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *United States v. BP Amoco Oil, PLC*, 277 F.3d 1012, 1020 (8th Cir. 2002) (quoting *Cannons Eng'g*, 899 F.2d at 87). To be substantively fair, a consent decree must be "based upon, and roughly correlated with, some acceptable measure of comparative fault." *Cannons,* 899 F.2d at 87.  However, "what constitutes the best measure of comparative fault . . . under particular factual circumstances should be left largely to the [agency's] expertise."  *Id.*  Furthermore, "[r]elative fault is not the only factor that district courts should take into account when appraising the fairness of a settlement. The likelihood of the plaintiff's prevailing at trial and the adequacy of the resources of the most culpable party, for example, may also be taken into account." *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1031– 32 (2d Cir. 1992).

          b.   Settling Defendant Doe Run will restore more than 40% of the allegedly injured stream miles.  *Compare* Consent Decree Appendix A, Doc. 2-2, at ⁋ 29 (requiring restoration of approximately 10 stream miles) *with* Complaint at ⁋ 21 (alleging that approximately 26 miles of stream sediments have been injured).  Doe Run's required enhanced restoration of terrestrial resources will restore over half the total acreage of tailings piles and transition zones around them in the Viburnum Trend, compare Consent Decree Appendix A,

Doc. 2-2, at ¶ 40 (requiring enhanced restoration of 1,240 acres of tailings piles and transition

zones) *with* Complaint at ¶ 21 (alleging terrestrial injuries due to approximately 2,000 acres of

tailings and hundreds of acres of contaminated transition zones), and the most highly

contaminated soils around the Buick Resource Recycling Facility, *see* Memorandum at 11; *see*

*also* Consent Decree Appendix A, Doc. 2-2, at ¶ 40 (requiring restoration of 810 acres of

allegedly injured terrestrial resources around the Buick Resource Recycling Facility).  In

addition, Doe Run will donate approximately 1,000 acres of ecologically significant land for

conservation within the Viburnum Trend, and another approximately 100 acres near the

Herculaneum Lead Smelter Site, where it is the only potentially responsible party, which

represents a substantial acquisition of equivalent resources for the Trustees. [2]  *See* Memorandum

at 11.

   c. Doe Run's restoration work will be consistent with the Restoration Plans

for the Viburnum Trend and the Herculaneum Lead Smelter Site.  Consent Decree at ¶ 65.

These plans were attached in draft form as Appendix D to the Consent Decree, *see* Dkt. 2-5, and

published for public comment concurrently with the Consent Decree.  *See* 85 FR 9807-01 (Feb.

20, 2020).  The Trustees did not receive any public comment and have finalized the Restoration

Plans in a manner substantively identical to the draft plans.  *See*

https://www.fws.gov/midwest/es/ec/nrda/SEMONRDA/index.html.  As set forth in those

---

[2] Doe Run will donate approximately 500 acres of ecologically valuable inholdings within the Mark Twain National Forest to the USDA, which will eventually be incorporated into the National Forest.  Doe Run will donate approximately 500 acres of ecologically valuable land to the Missouri Department of Conservation (MDC), or another designee jointly selected by the Trustees and Doe Run if for some reason MDC is unable to accept the donation.  The land proposed for donation to MDC is adjacent to an existing MDC conservation area, and will be subject to a federally enforceable restrictive conservation easement on the donated land.  Finally, Doe Run will donate a further 105 acres of ecologically valuable land adjacent to the Herculaneum Smelter to a designee mutually agreed upon by the Trustees and Doe Run.  Any designee will record and maintain a federally enforceable restrictive conservation easement on the donated land.  See Consent Decree Appendix A, Doc. 2-2 at § II.

Restoration Plans, the projects contemplated by this Settlement will restore, replace, and/or acquire the equivalent of the injured natural resources.

d.   Homestake will reimburse the majority of the Trustees' alleged unreimbursed past assessment costs. Memorandum at 11; *see also* Consent Decree at ¶¶ 4-6; Complaint at ¶ 22.  Homestake will also pay $100,000 of the Trustees' future oversight costs, Consent Decree at ¶ 7, provide $1.44 million in funding for a portion of Doe Run's restoration work, id. at ¶ 8, and post $2 million in financial assurance for the primary restoration of highly contaminated Buick Smelter soils, *id.* at § VII.

e.   The proposed Consent Decree is substantively fair because it requires the Settling Defendants, who are among the potentially responsible parties for the alleged natural resource injuries in the Viburnum Trend (and, as to Doe Run, the sole potentially responsible party at the Herculaneum Lead Smelter Site), to fund or implement restoration projects at their expense that will return resources to baseline condition, and compensate the public for the loss of services of those resources until replacement, and to pay a significant portion of the Trustees' past and future costs.  *See United States v. Bd. of Trs. of the Univ. of Illinois*, No. 07-CV-2188, 2008 WL 345542, at *2 (C.D. Ill. Feb. 7, 2008) (NRD consent decree is substantively fair "in that it recovers the past costs of assessing the damages to natural resources and future restoration costs in a reasonable amount").  According to the Memorandum, Doe Run bears a more significant portion of the costs for the restoration projects than does Homestake because its periods of ownership and operation of the Sites greatly exceeds that of Homestake (and continues to the present day, unlike Homestake).  Memorandum at 11.  For purposes of assigning liability as between Settling Defendants in a consent decree, this is an "acceptable measure of

8

comparative fault," *see Cannons Eng'g*, 899 F.2d at 87, and further supports the conclusion that

the Consent Decree is substantively fair.

       f.   The Court is further assured of the substantive fairness of the Consent

Decree by the fact that the United States provided public notice and an opportunity to comment

on the Consent Decree and received no comments.

     14.   <u>Reasonableness</u>.

       a.   Three factors are relevant to determining whether a CERCLA settlement is

reasonable:  (1) technical adequacy of the work to be performed in cleaning the environment; (2)

satisfactory compensation to the public for the government's costs; and (3) the risks and delays

inherent in litigation. *Cannons Eng'g*, 899 F.2d at 89–90.

       b.   Here, the Settling Defendants are agreeing to perform, or fund the

performance of, substantial restoration projects that are set forth in the final Restoration Plans

attached hereto after a public notice and comment period.  Those Restoration Plans are the result

of the Trustees' NRDA process consistent with applicable regulations (43 C.F.R. Part 11). As

part of the NRDA, the Trustees conducted studies, analyzed data, and applied their expertise (as

well as those of consulting outside experts) to determine and quantify injury and identify

appropriate measures to restore, replace, and/or acquire the equivalent of allegedly injured

natural resources.  Appendix A to the Consent Decree, Doc. 2-2, reflects the Parties' careful and

extensive negotiation of key technical aspects of this restoration work, all conducted under the

guidance of an experienced neutral mediator.  As such, the restoration work the Settling

Defendants are required to fund or perform under the Consent Decree is technically adequate.

     15.   In addition, the Settling Defendants will reimburse the majority of the Trustees'

unreimbursed past assessment costs, as well as an initial $100,000 toward their future costs and

annual reimbursements of up to $25,000.  Consent Decree at ¶ 7.[3]  Although it is possible that

the Trustees' future restoration implementation and monitoring costs will exceed these amounts,

according to the Memorandum, the Settling Defendants' payments will defray a substantial

portion of the governments' costs.  Memorandum at 13.  This is satisfactory compensation to the

public for the governments' costs, particularly in light of the cost savings that, according to the

Memorandum, the Trustees will realize by the fact that Doe Run rather than the Trustees will be

performing the restoration work.  *Id.*

16.      The compromise of past assessment and future restoration implementation and

monitoring costs is also reasonable in light of the risks and delay attendant to litigating the

Plaintiffs' claims to conclusion.  "Discounts on maximum potential liability as an incentive to

settle are considered fair and reasonable under Congress's statutory scheme" and it "is

appropriate to factor into the equation any reasonable discounts for litigation risks, time savings,

and the like that may be justified."  *United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001).  This

is particularly true in this case because, according to the Memorandum, the Plaintiffs' allegations

rely on scientific theories and data inherently subject to a "war of the experts" approach to

litigation, which can be time-consuming and resource intensive even when successfully fought.

Memorandum at 13.  Furthermore, extensive litigation would greatly delay restoration of the

allegedly injured natural resources, and of the services they provide, that the Restoration Projects

to be implemented by Doe Run will accomplish.

---

[3] The Plaintiffs allege that the Trustees have incurred approximately $3.1 million in unreimbursed natural resource
damage assessment costs.  Complaint, ¶ 22.  Homestake will pay $1.8 million to reimburse these costs.  Consent
Decree at ¶¶ 4-6.

17.  <u>Consistency with CERCLA</u>.

a.  The "two main objectives underlying CERCLA" are first, "to encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties," and second, "to encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992); *see also Dico*, 340 F.3d 525 at 529 (8th Cir. 2003). The proposed Consent Decree accomplishes both objectives and is therefore consistent with CERCLA.

b.  The proposed Consent Decree requires the Settling Defendants (who are responsible parties) to implement or fund restoration projects that the Trustees have determined will compensate the public for the alleged natural resource injuries at the Sites and to reimburse certain of the Trustees' assessment and implementation costs.  *See ConocoPhillips*, 2011 WL 1113703, at *3 (NRD consent decrees are consistent with federal and state law where they require defendants to compensate for injuries to natural resources); *Fort James Operating Co.*, 313 F. Supp. 2d at 911 (NRD consent decree consistent with CERCLA because it imposes accountability on defendant, allows restoration work to begin, and is consistent with preference for settlement).

c.  The proposed Consent Decree prevents the need for costly and time-consuming litigation that would delay the restoration of the allegedly injured natural resources for years.  It is thus consistent with CERCLA's structure, which encourages settlement so that public funds are not wasted in litigation expenses. *See Hercules*, 961 F.2d at 800 (finding consent decree consistent with CERCLA because settling defendant's "finite funds are better put to use in helping to clean up the . . . site than in litigation costs.").

Accordingly,

**IT IS HEREBY ORDERED** that [8] the United States' Unopposed Motion to Enter

Consent Decree is GRANTED.  The Court will separately enter the Consent Decree via its

signature on Page 46 thereof.

So Ordered this 14th day of July, 2020.

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

12